155 P.3d 1054

In the Matter of the ESTATE OF
William D. HEADSTREAM,
Deceased.

John J. Gorman, as Personal Represen-
tative of the William D. Head-
stream Estate, Appellant,

v.

State of Arizona ex rel. Steven Owens,
Director of the Arizona Department
of Environmental Quality, Appellee.

No. 1 CA–CV 06–0010.

Court of Appeals of Arizona,
Division 1, Department C.

April 5, 2007.

Mariscal Weeks McIntyre & Friedlander, PA By James S. Rigberg, William Novotny, Phoenix, Attorneys for Appellant.

Terry Goddard, Attorney General By Robert V. Ward, Assistant Attorney General, Jerald C. Thompson, Assistant Attorney General, Phoenix, Attorneys for Appellee.

## OPINION

IRVINE, Judge.

¶ 1 Appellant John Gorman ("Gorman"), successor personal representative of the estate of William D. Headstream, appeals the probate court's decision ordering him to pay from the estate a claim of $2.2 million to the Arizona Department of Environmental Quality ("ADEQ" or "State"). Gorman argues that the claim, which arose from the need to remediate contamination caused by underground storage tanks owned by decedent, remains unliquidated and that further proceedings to determine the appropriate amount of payment are necessary. We agree. Therefore, we reverse and remand for further proceedings.[1]

## FACTS AND PROCEDURAL HISTORY

¶ 2 ADEQ submitted a claim by letter to the estate of William D. Headstream. The

January 31, 2002 letter advised the estate that Headstream had neither properly closed two underground storage tank ("UST") systems nor performed corrective actions to remedy a release of a regulated substance from the UST systems at the gas station, known as Ted's Truck Center, owned and/or operated by Headstream and his wife. The letter stated:

> The exact amount of the State of Arizona's claim is currently unknown. Until the underground storage tank systems are properly closed and the full extent and location of any contamination resulting from underground storage tank releases at the facility is determined pursuant to Title 9[sic], Chapter 6 of the Arizona Revised Statutes, the exact amount of the State of Arizona's claim cannot be determined.

> The State of Arizona, however, estimates its claim to be approximately 2.2 million dollars, the amount required to properly complete underground storage tank closure and corrective action requirements at the facility.

Neither the original co-personal representatives nor Gorman[2] filed a notice disallowing the claim under Arizona Revised Statutes ("A.R.S.") section 14–3806 (2005).

¶ 3 Three years later, the State filed an Application for Allowance of Claim. The May 2005 application noted that ADEQ had timely submitted a claim to the estate, that the personal representative had taken no action on the claim, and that by statute a claim is deemed allowed if the personal representative fails to act on the claim within sixty days after the claims period expires. See A.R.S. § 14–3806. The application sought an order directing the estate to pay $2.2 million or to provide for future payment in accordance with A.R.S. § 14–3810 (2005), which governs contingent or unliquidated claims.

---

1. It appears that most of Headstream's assets were transferred to a trust shortly before his death, that the trust assets have already been distributed and that the assets remaining in the estate are insufficient to satisfy the State's claim. Efforts are apparently underway to recover some of the distributed assets to satisfy the State's claim. The narrow issue presented in this appeal does not extend to whether the State will actually be paid.

2. Gorman was appointed personal representative in June 2002.

¶ 4 Gorman filed an objection to the ADEQ Application. The estate argued that the State's claim remained contingent because ADEQ had not and might not ever incur any costs to correct any problems caused by the improper closure and leakage of the USTs. The estate noted that it was willing to perform the required corrective actions if it was deemed eligible to receive reimbursement for ninety percent of its costs from the State Assurance Fund ("SAF") pursuant to A.R.S. § 49–1054 (2005), in which case the State would incur no costs for the corrective measures. If the estate was not eligible for reimbursement, the State would incur the costs of implementing corrective measures, but, according to the estate, would be able to recover ninety percent of its costs from the SAF. According to the estate, the estate would then be liable for only ten percent of the remediation costs.

¶ 5 The objection also asserted that the claim remained unliquidated because the letter did not address the scope of the estate's liability and because the letter itself admitted that the costs involved were unknown. The estate acknowledged that the USTs were not properly closed, that the decedent had operated the USTs and that a regulated substance was released from the USTs. The estate argued that it had attempted to determine the actual conditions at the UST site in compliance with the letter and that it disputed whether the additional actions sought by the State were required.

¶ 6 In reply, the State argued that it was statutorily required to take action when the responsible party is incapable of doing so. Moreover, because La Paz County acquired the property through tax foreclosure, the State claimed the estate no longer controlled the subject property and so could not undertake corrective action. The State further argued that the estate was ineligible for reimbursement from the SAF. The State asserted it would have to expend $2,213,000 to perform corrective actions and attached an itemized list of costs. The State further argued that it was owed penalties under A.R.S. § 49–1013(D) (2005), the maximum amount of which was $175,340,000 up to June 2002. The State also argued that even if its claim was contingent, the personal representative was still required by statute to notify the claimant of action on the claim to prevent the claim being deemed allowed and had not. Therefore, the State claimed it was entitled to payment from the estate if the funds are deemed due, or, if not due, it was entitled to the present value of the claim or to receive future payment.

¶ 7 After oral argument on ADEQ's Application, the court told the parties:

> Here are my thoughts on the matter. It really doesn't appear to be a liquidated claim at this point, and to me, a liquidated damage claim is for—for damages that are liquidated and they are predetermined in a contract and there is going to be breach, X pays a certain amount of money to Y, and X breaches and the damages are written in the contract.

> But here, although you are estimating that there is going to be a substantial amount of money spent by the State for cleanup, whatever liquidated amount is liquidated, it has been liquidated by the State.

> So there is some issue there as to whether or not this is really a liquidated claim. And I do look at this as a default—some sort of a default proceeding where it is a liquidated claim, you really wouldn't even need a hearing, and if it's not, there has to be some evidence presented.

¶ 8 The court granted the State's Application for Allowance of Claim. The order noted that the State's claim was timely and that the estate had not denied or otherwise responded to the claim. It directed the personal representative to provide for payment to the State from the estate. The estate appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B), (J) (2003).

## DISCUSSION

¶ 9 The essential facts in this case are undisputed. We review de novo the court's application of the law to the facts. *See Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 114, 412 P.2d 47, 51–52 (1966). We likewise review de novo the legal conclusions reached by the trial court. *In re Estate of*

*Travers,* 192 Ariz. 333, 334–35, ¶ 11, 965 P.2d 67, 68–69 (App.1998).

¶ 10 Gorman argues that ADEQ's claim was an unliquidated claim whose exact amount has yet to be determined. Gorman contends that A.R.S. § 14–3810 therefore required the court to arrange for future payment upon liquidation, rather than payment of an estimated claim. Statutory interpretation is a question of law we consider de novo. *State Comp. Fund v. Superior Court,* 190 Ariz. 371, 374–75, 948 P.2d 499, 502–03 (App. 1997). In interpreting a statute, we look first to its language as the best indicator of its meaning. *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991).

¶ 11 Section 14–3810, which governs "[c]laims not due and contingent or unliquidated claims" provides:

A. If a claim which will become due at a future time or a contingent or unliquidated claim becomes due or certain before the distribution of the estate, and if the claim has been allowed or established by a proceeding, it is paid in the same manner as presently due and absolute claims of the same class.

B. In other cases the personal representative or, on petition of the personal representative or the claimant in a special proceeding for the purpose, the court may provide for payment as follows:

1. If the claimant consents, he may be paid the present or agreed value of the claim, taking any uncertainty into account.

2. Arrangement for future payment, or possible payment, on the happening of the contingency or on liquidation may be made by creating a trust, giving a mortgage, obtaining a bond or security from a distributee, or otherwise.

"Liquidated" has been defined as "([o]f an amount or debt) settled or determined, esp. by agreement." Black's Law Dictionary 949 (8th ed.2004). "A claim is liquidated 'if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion

or discretion.' " *N. Ariz. Gas Serv. v. Petrolane Transp., Inc.,* 145 Ariz. 467, 479, 702 P.2d 696, 708 (App.1984) (quoting *Homes & Son Constr. Co. v. Bolo Corp.,* 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974)). "Unliquidated" has been defined as "[n]ot previously specified or determined <unliquidated damages>." Black's Law Dictionary 1574 (8th ed.2004). An unliquidated claim is one "in which the amount owed has not been determined." *Id.* at 264.

¶ 12 The State argues that its claim is subject to mathematical calculation. It contends that the cost to complete closure and corrective actions was always known to ADEQ. It also asserts that the claim for statutory penalties for failure to properly complete closure and take corrective measures was subject to mathematical calculation and was therefore a liquidated claim.

¶ 13 The State relies heavily on its assertion that its claim includes a claim for statutory penalties pursuant to A.R.S. § 49–1013(D) against Headstream for his failure to properly close the USTs and that the amount of this penalty was capable of being calculated. How the ability to calculate a maximum potential penalty of $175,340,000 [3] supports the position that a $2.2 million claim is liquidated is unclear to us.

¶ 14 In any event, the penalties were not mentioned in the original claim letter. The January 2002 letter described the asserted claim as "the amount required to properly complete underground storage tank closure and corrective action requirements at the facility." Although an earlier letter sent to Mrs. Headstream on January 24, 2002, asserted that "ADEQ will seek all available statutory penalties for failure to timely perform all required actions[,]" it did not actually assess any such penalties. The January 31, 2002, claim itself did not specifically refer to penalties.

¶ 15 The State argues, however, that under *Estate of Page v. Litzenburg,* 177 Ariz. 84, 865 P.2d 128 (App.1993), the letter gave adequate notice of the claim for penalties. In

---

**3.** This amount is based on the State's calculation that Headstream was subject to a civil penalty not to exceed $10,000 per day of violation pursu-

ant to A.R.S. § 49–1013, and Headstream had been in violation for 17,534 days.

*Estate of Page,* this court found that a creditor's claim based on quantum meruit was sufficient to support an award based on a theory of oral contract. 177 Ariz. at 89–90, 865 P.2d at 133–34. The court found that a claim need not specify in detail the legal theory on which it is based or be drafted with precision and completeness. *Id.* at 89, 865 P.2d at 133. The court quoted approvingly from a Utah case, which stated that a claim is sufficient if it "acquaints a personal representative with a specific amount allegedly due and the general nature of the obligation.... It is inconsequential that the claim did not articulate particular legal theories upon which payment of the claim would be [sic] most appropriately be premised." *Id.* at 90, 865 P.2d at 134 (quoting *DeMentas v. Estate of Tallas,* 764 P.2d 628, 630–31 (Utah App.1988)).

¶ 16 The State contends that the letter adequately advised Gorman that the State's claim included penalties because the January 31, 2002, letter stated that the claim was based on violations of "Title 49, Chapter 6 of the Arizona Revised Statutes," which contains a section providing for penalties. In *Estate of Page,* however, the nature of the claim, regardless of the legal theory, was the same. The claimant was seeking compensation for services rendered to the decedent. *Estate of Page,* 177 Ariz. at 90, 865 P.2d at 134. Here, the two claims were different.[4] The claim articulated in the letter is based on the cost to properly close the USTs and to correct the damage caused by the release of petroleum into the environment. The penalties, on the other hand, are punitive measures for violating statutory requirements not directly related to the cost of cleanup. Unlike the claim in *Estate of Page,* more than the applicable legal theory differs between the two asserted claims. Consequently, the

State did not properly include any claim for penalties in its 2002 claim, so any subsequent claim is barred as untimely.[5] *See* A.R.S. § 14–3804(1) (2005) (explaining the requirements of a claim: "its basis, the name and address of the claimant and the amount claimed[ ]").

■ ¶ 17 Turning to the cost of corrective action claim, we conclude that the claim is not for a liquidated sum. The State's letter giving notice of its claim described the $2.2 million claim as an estimate and elaborated that the exact amount could not be determined until the USTs were properly closed and the extent of the contamination had been determined.[6] In its reply to its Application for Allowance of Claim, the State asserted that it would expend $2,213,000.00, and provided as support an exhibit containing an itemized list of costs for site characterization and remediation. The origin of the list and bases for the costs listed are not identified, although the list was purportedly prepared by the State's expert hydrologist. The exhibit describes the costs as "estimated." These estimated costs do not represent a determined, fixed or settled amount.

¶ 18 Moreover, in addition to presenting estimated costs, the State's calculation includes an additional fifteen percent for both site characterization and remediation for "unknowns." Although we recognize the prudence of planning for contingencies, if the reason for the expenditure is unknown, the need for the ultimate expenditure cannot be certain and the amount of the claim cannot be calculated with exactness.

¶ 19 The parties do not appear to dispute that the State has yet to incur these costs. At oral argument before this court, the State admitted the bid process for the clean-up was

4. The use of the funds also differs. Penalties must be deposited into the State's general fund. A.R.S. § 49–1013(G). Payments for the costs of corrective action reimburse the State for those costs, A.R.S. § 49–1017(C), and may be used to reimburse the SAF for any corrective action costs paid out of the SAF. A.R.S. § 49–1051(C). Although the record does not show the source of funds for the State's corrective actions, monies in the SAF may be used to pay ADEQ's costs incurred under A.R.S. § 49–1017. *See* A.R.S. § 49–1051(B)(4).

5. Because we find the State did not assert a timely claim for penalties, we need not address whether the penalty claim remains unliquidated.

6. *See* A.R.S. § 49–1017(C) (2005) ("If direct costs are incurred by the director for undertaking corrective action ... the owner and operator are liable to this state for these direct costs....").

currently underway. Consequently, at this time the State itself cannot say with certainty what the process will cost. Therefore, the trial court erred by ordering the payment of a fixed amount.

¶ 20 The State argues, however, that because the claim was initially allowed by the estate, the probate court could and did fix the amount of the claim under A.R.S. § 14–3810(A). We disagree.

¶ 21 Arizona Revised Statutes § 14–3810(A) provides that "[i]f a . . . contingent or unliquidated claim becomes due or certain before the distribution of the estate, and if the claim has been allowed or established by a proceeding, it is paid in the same manner as presently due and absolute claims of the same class." The State contends that the court simply established the amount of the claim. Under the statute, however, the claim must be both allowed or established *and* liquidated. The court's establishment of the claim under the statute, therefore, cannot refer to fixing the amount because a contingent or unliquidated claim must have become certain for the subsection to apply. If the amount of the claim is certain, no need exists for the court to establish the amount. Rather, it is the claim, not the amount of the claim, that is "allowed or established." In this case, the claim was deemed allowed by the personal representative's failure to disallow it, but the amount remained uncertain or unliquidated.

¶ 22 The State contends that the estate has no right to an evidentiary hearing to determine if the amount owed has become liquidated because the personal representatives failed to disallow the claim. In support, the State relies on two Florida cases, *Goggin v. Shanley,* 81 So.2d 728, 729 (Fla.1955) and *Sessoms v. Johnson,* 378 So.2d 1260, 1262–63 (Fla.App.1979), which hold that a court has no power to reject a claim where the claim was timely brought and the personal representative failed to object. These cases, however, concern the failure to disallow liquidated claims, not claims where, as here, the claim is acknowledged but the amount is unliquidated and the parties dispute the amount.

¶ 23 Arizona Revised Statutes § 14–3810 clearly contemplates circumstances where a claim for unliquidated damages has been allowed by a personal representative. Consequently, the failure to object to the claim cannot in itself preclude a personal representative from challenging whether the amount sought under the claim has been liquidated.

¶ 24 The State asserts that the court considered evidence and determined the amount of the claim to be $2.2 million. The evidence on which the State relies is the list of estimated costs to properly close the USTs and to take corrective measures. Gorman argues that the proceeding before the probate court was an oral argument, not an evidentiary hearing, and that these items were not admitted as evidence.

¶ 25 Even assuming that the court considered the State's exhibits, those documents do not establish that the claim amount was liquidated. As already noted, the itemized list of costs was an estimate and included an amount for unknown expenses. The State asserts that it need make only a prima facie case, implying that this information is sufficient. Citing *Tucker v. Reil,* 51 Ariz. 357, 361, 77 P.2d 203, 205 (1938), the State argues that a claimant with a claim for services and merchandise need only show that it really furnished the decedent with the services or the value of those services. The flaw in the State's argument is that it has not shown that the remediation services for which it is seeking payment have been provided.

¶ 26 The State's claim has been allowed by the estate, but it remains unliquidated. The State is entitled to recover on the claim as provided in A.R.S. § 14–3810—through an arrangement for future payment, through an agreement by the parties as to the amount or through payment of the claim if the amount is liquidated before the distribution of the estate. A.R.S. § 14–3810; *see also Jensen v. Ramras,* 792 P.2d 668, 670–71 (Alaska 1990) (finding that the probate court had the statutory authority to require the estate to post security for the debt in the event of a default). Consequently, we remand the matter to the probate court for further proceedings.

¶ 27 Gorman seeks an award of attorneys' fees and costs from the estate. A personal representative who prosecutes or defends an action in good faith "is entitled to receive from the estate his necessary expenses and disbursements including reasonable attorneys' fees incurred" regardless of whether he prevails. A.R.S. § 14–3720 (2005). We therefore award Gorman his necessary expenses and reasonable attorneys' fees from the estate upon his compliance with Rule 21(a), Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

¶ 28 We find that the State's claim, although allowed by the estate, remains unliquidated. Therefore, we reverse the order of the probate court and remand for further proceedings.

CONCURRING: MAURICE PORTLEY, Presiding Judge and DONN KESSLER, Judge.